UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DARTANIAN HAWKINS,**

      **Petitioner,**

  v.

    Case No. 2:17-CV-00466
    JUDGE GEORGE C. SMITH
    Magistrate Judge Jolson

**WARDEN, ROSS CORRECTIONAL INSTITUTION,**

      **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the Petition (Doc. 1) be **DENIED** and this case be **DISMISSED**.

### I. FACTS AND PROCEDURAL HISTORY

#### A. Facts

The Ohio Tenth District Court of Appeals summarized the facts of the case as follows:

> In the early morning hours of October 20, 2012, Whitehall Police Sergeant Rex Adkins received a dispatch regarding the discovery of a body "wrapped in trash bags laying in the roadway on Eastway Court," Whitehall. (Tr. Vol.I, 57.) Upon arriving at the scene, Sergeant Adkins checked the body and detected no pulse.
>
> Whitehall Police Detective Steven Brown was dispatched to the scene that morning and observed a "body * * * at the curb." (Tr. Vol.I, 70.) The body was "naked with the top half covered by one trash bag and the bottom half by another." (Tr. Vol.I, 70.) Law enforcement personnel identified the victim as Michael Payne, a Whitehall resident.

Detective Brown contacted the victim's parents, who provided the detective with the name "Amy Lambert," a "woman who is said to be his girlfriend, who he had been seeing for years and who had recently gotten out of jail after doing four years." (Tr. Vol.I, 78–79.) Payne's parents "were immediately suspicious of her." (Tr. Vol.I, 79.) The parents last saw their son "the previous day, Friday the 19th, around 12:30 in the afternoon" as he was "getting into his Yukon and Amy was in the vehicle." (Tr. Vol.I, 79.) Lambert "appeared to be hiding in the front seat," knowing that "the parents don't like her." (Tr. Vol.I, 79.) The parents provided information regarding an apartment complex where Lambert "was last known to be staying." (Tr. Vol.I, 79.) Payne's parents also informed the detective that their son had purchased a life insurance policy benefiting "Amy Lambert, another reason that they felt she might be involved." (Tr. Vol.I, 106.) Detective Brown later learned that Payne had taken out a $100,000 life insurance policy with American Family Insurance, naming Lambert as the sole beneficiary.

Police detectives subsequently located the victim's Yukon at an apartment complex, and observed trash bags in the cargo area. Detective Brown described the trash bags found covering the victim's body as "very unique. They were a metallic silver with a bright blue tie, not the typical black or white trash bags." (Tr. Vol.I, 81.) Detectives observed "one of those trash bags" in the back of the Yukon, which "immediately led us to believe that this vehicle and/or Amy had something to do with the murder." (Tr. Vol.I, 81.)

Detectives then drove to an apartment building located on East Livingston Avenue, where they observed a female following a male down the stairwell of the building. The male was carrying a large black trash bag and a smaller grocery bag. One of the detectives approached the woman and showed her a picture of Lambert. The female "denied knowing her, and * * * identified herself as Faustina." (Tr. Vol.I, 84.) After further questioning, the woman admitted that she was Lambert.

Detective Brown questioned the male, later identified as Jeffrey Bagley. The man appeared nervous, and denied knowing Lambert. Detective Brown placed him under arrest after learning that the woman at the scene was Lambert. Detective Brown looked inside the black bag and "immediately saw * * * one of those silver-with-blue-tie trash bags, just like the body had been * * * dumped in." (Tr. Vol.I, 86.) Upon looking inside the grocery bag, the detective

"could see a black garment with what looked to be blood on it." (Tr. Vol.I, 86.)

Detective Brown observed what "appeared to be the clothing, shoes, from the victim" inside the bags. (Tr. Vol.I, 92.) The investigation revealed "attempts to clean the body of evidence." (Tr. Vol.I, 92.) Detectives found two pair of latex gloves, as well as "bowls and tooth brushes," and they noticed a strong chemical odor. (Tr. Vol.I, 92.) Detectives "learned that bleach water was put in these bowls," and the victim's hands were "soaked in them" and "the tooth brushes had been used to clean his fingernails in [an] attempt to hide potential evidence." (Tr. Vol.I, 93.) Detectives also found an HDMI computer cable cord that was "consistent" with what the investigation revealed was the likely murder weapon used to strangle the victim. (Tr. Vol.I, 92.) Detectives later compared the metal mesh pattern on the cord they found with markings on the victim's neck, and "the markings on the neck * * * were consistent with this." (Tr. Vol.I, 95.)

Detectives found a variety of clothing, including "a Michigan sweatshirt, which Mr. Payne's parents had said he was likely to be wearing." (Tr. Vol.I, 94.) The clothing had been "cut off of the victim." (Tr. Vol.I, 94.) Detectives found a blood stained blue blanket with a "Big Deals" store tag, as well as a pair of gray sweatpants containing a blood stain. (Tr. Vol.I, 97.) In Bagley's pants pocket, detectives recovered a Wal–Mart receipt, dated October 20, 2012, for the purchase of a cleaning product, as well as a "Discover Card cut in half in the name of Michael Payne." (Tr. Vol.I, 104.)

Detectives surmised that Bagley was walking to the dumpster to dispose of these items when they encountered him. A subsequent search of the dumpster revealed two silver trash bags containing "vinyl gloves, some plastic gloves, [a] plastic Baggie with paper bindles that indicated drug use, and * * * a handwritten document that was linked to [Williams]." (Tr. Vol.I, 106.)

Detectives recovered a receipt from a Big Deals store for the purchase of cleaning supplies on October 19, 2012, at 7:20 p.m. Surveillance video the police later obtained from the store revealed that "Maxamillion Williams and Amy Lambert were in Deals making this purchase." (Tr. Vol.I, 109.) In the video, Williams was depicted wearing sweatpants "consistent with the sweatpants" detectives "found in the trash bag with the bloodstain on them." (Tr. Vol.I, 110.)

During the investigation, detectives obtained property belonging to appellant, including a pair of jeans with a blood spot on an inside pocket, as well as a black backpack; the backpack contained an American Family Insurance vehicle insurance card bearing the name of Michael Payne, and a Reynoldsburg United Methodist Free Store membership card in the name of Michael Payne. Detectives recovered some of these items, including the jeans, from the Columbus residence of appellant's mother; she provided detectives with three trash bags full of clothing and other personal items. The clothing was located in a shed outside the residence.

Other items belonging to appellant, including the backpack, were recovered from the home of Robert Dalton's mother. The investigation revealed that appellant had been staying with Dalton, at the home of Dalton's mother, around the time of the murder. Dalton's mother called Detective Brown and told him "she had some of [appellant's] personal effects that she didn't know what to do with." (Tr. Vol.I, 149.) The detective went to her residence and she handed Detective Brown a trash bag full of items. Detectives later learned that Dalton was present when Payne was murdered.

Following Lambert's initial arrest, detectives had not yet established her involvement, and she was released and "placed * * * with her grandfather" because "the story" she was providing detectives was that she was in fear of appellant and Williams. (Tr. Vol.I, 125.) Several hours later, after obtaining additional information, detectives returned to Lambert's grandfather's residence to place her under arrest. Lambert, however, "had left her grandfather's house, had stolen his vehicle and stolen his debit card." (Tr. Vol.I, 125.) Police subsequently arrested Lambert in Miami, Florida, and law enforcement personnel transported her back to Ohio.

The day after the incident, Williams "flew from Port Columbus to Miami" and boarded a cruise ship. (Tr. Vol.I, 126.) The ship made a stop in Cozumel, Mexico, and Williams "got off the cruise ship in Cozumel and did not reboard." (Tr. Vol.I, 126.) Law enforcement personnel subsequently arrested Williams in Mexico, and he was returned to the United States. Appellant made arrangements to turn himself into police. Police detectives obtained cell phone records of Williams and appellant.

The Bureau of Criminal Investigation ("BCI") assisted the Whitehall Police Department with the homicide investigation. BCI Agents Stephanie Herron and Todd Fortner collected 34 items from an apartment leased by Williams at the Embassy Plaza

Apartments, located at 4069 East Livingston Avenue. Agent Herron identified silver trash bags with blue ties found in the apartment similar to the bags used to wrap the victim's body. Agents also found fingernail clippers, scissors, a payment voucher for a GMC Yukon, a credit/debit card in the name of Michael Payne, a firearm, and latex gloves. Agents also collected items from the Yukon, including a blanket with bloodstains and a silver trash bag. Agent Herron subsequently examined the victim's body and noted that his fingernails had been clipped short, and that "one of his fingernails was clipped back so far that there was a little bit of blood there." (Tr. Vol.II, 221.)

Dalton, age 22, testified that he grew up with appellant in Columbus. Appellant stayed at the home of Dalton's mother during an approximately two-month period near the time of the events at issue. Appellant had nicknames of "D" or "Tain." (Tr. Vol.II, 243.) Dalton knew Williams through appellant.

Dalton gave the following account of the events on October 19, 2012. That morning, Dalton was at Williams' apartment where he had spent the previous evening. Also present were Lambert, Williams, Bagley, Payne, and an individual named "Duke." (Tr. Vol.II, 246.) Appellant had also been at Williams' apartment, but had left to visit his girlfriend. Lambert introduced Payne as her fiancé. Payne was only at the apartment for approximately 15 minutes that morning and left with Lambert. Bagley and Duke also left the apartment during the morning.

Later that day, Lambert returned to the apartment "and got [Williams]. And [Williams] was getting ready to go with her." (Tr. Vol.II, 248.) Lambert and Williams told Dalton "to stay, they would be right back there. They were going to get [appellant]." (Tr. Vol.II, 248.) Later, while alone in the apartment, Dalton heard the sound of a male screaming outside. Lambert came inside the apartment "looking for something." (Tr. Vol.II, 251.) Appellant and Williams then entered the apartment with Payne. Appellant and Williams were fighting with Payne, who did not want to come inside.

The two men forced Payne inside, and closed the door; Williams and appellant "were jumping him." (Tr. Vol.II, 253.) The two men took Payne down the hallway toward the bathroom. Dalton remained on the couch during this time because he "was scared." (Tr. Vol.II, 254.) Inside the bathroom, Williams and appellant "put a backpack over [Payne's] head, [and] continued to beat him." (Tr. Vol.II, 254.) The two men were "punching and kicking" Payne.

5

> (Tr. Vol.II, 254.) Lambert was "running around the house" helping Williams and appellant, and she took a cord from behind a television. (Tr. Vol.II, 255.)
>
> Payne eventually "fell to the ground." (Tr. Vol.II, 255.) Payne was lying on the floor and appellant was strangling him with a cord. Payne was "trying to push him off of him, fight[ing] back." (Tr. Vol.II, 257.) Payne "[f]ought hard," but he eventually stopped struggling, and appeared to be unconscious. (Tr. Vol.II, 257.) During the time Payne was on the ground, Lambert removed Payne's wallet from his back pocket and was sorting through it. After Payne was strangled, Lambert "clipped his nails. She said he scratched her." (Tr. Vol.II, 258.) Dalton was told to "mind my business, stay out of it." (Tr. Vol.II, 258.)
>
> Approximately one hour after the incident, Bagley and Duke arrived at the apartment. Bagley later drove appellant and Dalton to the residence of Dalton's mother. Appellant remained at the Dalton residence until the following morning; he then "packed up his stuff, and * * * left." (Tr. Vol.II, 260.) Some of appellant's personal belongings remained at the Dalton residence. Police officers spoke with Dalton approximately one week later. Dalton initially told the officers he had not witnessed the murder. After the officers indicated they did not believe him, Dalton "told the truth." (Tr. Vol.II, 261.)

*State v. Hawkins*, No. 15AP-35, 2016 Ohio App. LEXIS 1277, 2016-Ohio-1404, ¶¶ 3–23 (Ohio Ct. App. 2016) (paragraph symbols omitted).

### B. Procedural History

#### 1. *State Conviction*

On October 31, 2012, a Franklin County Grand Jury returned an indictment charging Petitioner with two counts of aggravated murder, in violation of R.C. 2903.01, one count of kidnapping, in violation of R.C. 2905.01, and one count of aggravated robbery, in violation of R.C. 2911.01. (Doc. 9, State Court Record, Ex. 1, Case No. 12 CR 5591, PageID #: 35). Petitioner's co-defendant, Maxamillion Williams, was subsequently indicted on two counts of aggravated murder, one count of murder, one count of aggravated robbery, one count of

kidnapping, and one count of tampering with evidence. They were tried together. Petitioner, through counsel, pled not guilty. A jury found him guilty on all counts. On December 19, 2014, the trial court merged the two counts of aggravated murder (Counts Three and Four) and imposed a sentence of ten years to life imprisonment on Counts One and Two; and life imprisonment without Parole as to Count Four. (Doc. 9, State Court Record, Ex. 2, PageID #: 40).

    *2. Direct Appeal*

Represented by new counsel, Petitioner filed a timely notice of appeal to the state appellate court. (Doc. 9, State Court Record, Ex. 3, Case No. 15AP-35, PageID #: 41). He raised two assignments of error:

1. Mr. Hawkins' right to a fair trial guaranteed by the Sixth Amendment and the Fourteenth Amendment was violated by the ineffectiveness of his trial counsel in failing to challenge the admission of Mr. Hawkins' jeans and testimony and other evidence arising therefrom and of cards bearing the victim's name, which the State obtained by "unreasonable searches" that violated the Fourth Amendment.

2. The judgment is contrary to the manifest weight of the evidence. (R. #9, State Court Record, Exhibit 4, PageID #: 42). The State filed a responsive brief, to which Hawkins filed a reply. (R. #9, State Court Record, Exhibits 5-6, PageID #: 100, 135). On March 31, 2016, the Court of Appeals affirmed the judgment of the trial court. (R. #9, State Court Record, Exhibit 7, PageID #: 159).

Petitioner then filed a timely *pro se* appeal to the Supreme Court of Ohio. (Doc. 9, State Court Record, Ex. 8, Case No. 16-0767, PageID #: 190). He set forth one proposition of law:

I. Reversal of a conviction is warranted when the accused is deprived of a fair trial as guaranteed by the United States and Ohio Constitution and the resulting convictions are not supported by sufficient evidence and are against the manifest weight of the evidence and there is a clear case of ineffective assistance of counsel.

7

(R. #9, State Court Record, Ex. 9, PageID #: 192). On July 27, 2016, the Ohio Supreme Court declined jurisdiction and dismissed the appeal. (R. #9, State Court Record, Ex. 11, PageID #: 236).

### 3. *Federal Habeas Corpus*

On May 30, 2017, Petitioner, proceeding *pro se*, filed the instant federal habeas petition and raised two grounds for relief:

> Ground One: The Appellant was deprived of Due Process because of counsel ineffectiveness.
>
> Ground Two: The conviction was not supported by the manifest weight of the evidence.

(Doc. 1).

Upon review of the Petition pursuant to rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, the undersigned recommended dismissal of claim two and directed Respondent to show cause as to why the Petition should not be granted as to claim one. (Doc. 3). Petitioner did not object, and the District Judge adopted the Report and Recommendation. (Doc. 4). Respondent filed the Return of Writ on September 29, 2017 (Doc. 10), and Petitioner did not file a Reply.

## II. DISCUSSION

### A. Claim One

Respondent argues that claim one fails on the merits. The Court agrees.

#### 1. *Standard*

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA") govern Petitioner's claims. The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas

8

relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*,--U.S.--, 134 S. Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted)).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under AEDPA, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). The burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

2. *Application*

In claim one, Petitioner asserts that his counsel was ineffective. Specifically, he faults counsel for not moving to suppress certain evidence against him. The state appellate court rejected this claim on the merits:

> In order to prove ineffective assistance of counsel, a defendant must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), requiring the defendant to first "establish that counsel's performance was deficient, and second, the deficient performance prejudiced the defense." *State v. Riley*, 7th Dist. No. 13 MA 180, 2015-Ohio-94, ¶ 13, citing *Strickland* at 687. Under this test, "[e]ven if counsel's performance is considered deficient, a conviction cannot be reversed absent a determination that appellant was prejudiced." *Id.* A defendant seeking to establish prejudice as a result of trial counsel's deficient performance "must prove that there is a reasonable probability that but for counsel's serious error, the result of the trial would have been different." *Id.* An appellant "bears the burden of proof on the issue of counsel's ineffectiveness, and in Ohio, a licensed attorney is presumed competent." *Id.* at ¶ 15. Further, "'strategic or tactical decisions will not form a basis for a claim of ineffective assistance of counsel.'" *Id.*, quoting *State v. Dickinson*, 7th Dist. No. 03 CO 52, 2004-Ohio-6373, ¶ 11.

> A trial counsel's failure to file a motion to suppress "does not necessarily constitute ineffective assistance of counsel." *Riley* at ¶ 17, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, 2000-Ohio-448, 721 N.E.2d 52 (2000). Rather, counsel's failure to file a motion to suppress "may constitute ineffective assistance of counsel when the record demonstrates that the motion would have been granted." *Id.*, citing *State v. Barnett*, 7th Dist. No. 06-JE-23, 2008-Ohio-1546, ¶ 31.

> In general, "[t]he Fourth Amendment protects individuals from unreasonable search and seizure by the government." *State v. Corbin*, 194 Ohio App.3d 720, 2011-Ohio-3491, ¶ 24, 957 N.E.2d 849 (6th Dist.). In order to have standing to challenge a violation, however, "an individual must have a legitimate expectation of privacy in the subject matter of the search." *Id.*, citing *Minnesota v. Olson*, 495 U.S. 91, 95–96, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). It has been held that "[a] legitimate expectation of privacy is 'one that society is prepared to recognize as reasonable,'" and "[t]he burden is on the party asserting the motion to provide sufficient evidence to prove grounds for standing." *Corbin* at ¶ 24, quoting *Rakas v. Illinois*, 439 U.S. 128, 143-44, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

In *Olson*, the United States Supreme Court recognized that "an individual's status as an overnight guest is alone enough to establish a reasonable expectation of privacy." *Id.* at ¶ 25, citing *Olson* at 96–97. The ruling in *Olson*, however, "is limited in that it does not apply to prior overnight guests, regardless of the level of frequency, who failed to present sufficient evidence to show that they were an overnight guest at the time of the search." *Id.*, citing *State v. Davis*, 80 Ohio App.3d 277, 285, 609 N.E.2d 174 (8th Dist.1992). When an individual is not an overnight guest at the time of the search, "courts look at the totality of the circumstances in making a determination." *Id.* at ¶ 26.

In the present case, regarding the items recovered from the home of appellant's mother, Detective Brown testified that appellant's mother "provided us with three black trash bags full of clothing and other personal items that she identified as belonging to her son." (Tr. Vol. I, 118–19.) Appellant's mother told detectives that the clothing was "in a shed right outside the back door." (Tr. Vol. I, 148.) According to Detective Brown, appellant's "younger sister took us to the shed, opened it, and retrieved those bags that mom said had been placed in there." (Tr. Vol. I, 148.) Detective Brown did not recall whether the shed was locked.

With respect to items obtained from the Dalton residence, Detective Brown testified that he received a phone call from Dalton's mother who told the detective that "she had some of [appellant's] personal effects that she didn't know what to do with." (Tr. Vol. I, 149.) Detective Brown and another detective drove to the Dalton residence. Dalton's mother "invited us in, and a black trash bag and the book bag were sitting on the floor right inside the front door." (Tr. Vol. I, 150.)

One specifically established exception to the warrant requirement is "a search that is conducted with consent." *State v. Portman*, 2d Dist. No. 2013-CA-68, 2014-Ohio-4343, ¶ 11, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Further, "[c]onsent to search can be 'obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.'" *Portman* at ¶ 11, quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). Police officers "may conduct a search without a warrant so long as a third party who possesses common authority over the property voluntarily consents to the search." *State v. Reynolds*, 9th Dist. No. 19062, 1999 Ohio App. LEXIS 5005 (Oct. 27, 1999), citing *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). It has been noted that "'[c]ommon authority' exists when two or more persons have joint access or control over the property, each has the right to consent to permit inspection, and each has assumed the risk that any one of them might so consent." *Reynolds*, quoting *Matlock* at 172.

Under Ohio law, "a warrantless search based on consent by a third party who does not have common authority is valid if, at the time of the search, the police had evidence to support a reasonable belief that the third party had common authority." *Reynolds*. Thus, "[e]ven if an officer erroneously believes that a third-

11

party is authorized to give consent, using an objective standard, third-party consent is valid if an officer looking at the then-available facts could reasonably conclude that the third-party had apparent authority to consent." *Portman* at ¶ 13.

In a case cited by the state in the instant appeal, *State v. Helton*, 3d Dist. No. 8-92-18, 1993 Ohio App. LEXIS 828 (Feb. 19, 1993), police officers conducted a search of a residence owned by the defendant's sister, including a shed located on the property where the defendant kept his belongings. The defendant's sister had provided her consent to the search, and the defendant subsequently filed a motion to suppress, arguing that she lacked authority to give such consent. The trial court denied the motion, and the defendant challenged the court's ruling on appeal.

In *Helton*, the court rejected the defendant's challenge, holding in part that the defendant "did not own or occupy the premises searched, nor did he have any proprietary or property interest in the * * * shed * * * searched and he was not even present on the premises when the search was conducted." *Id.* The court, noting that the defendant's "single connection to the premises searched is that he is the brother of the owner/occupant," held that "[f]amilial status, by itself, does not grant standing to challenge a search and seizure." *Id.* Rather, the court held, without any relevant connection to the premises searched, the defendant lacked "a reasonable expectation of privacy in the areas searched that would allow him standing to challenge the voluntariness of his sister's consent." *Id.*

The court in *Helton* also observed that, under the totality of the circumstances, the defendant's sister freely and voluntarily gave her consent to the search. On that issue, the court addressed and rejected the defendant's claim that he had exclusive control over the shed based on evidence he possessed the only key. The facts in *Helton* indicated that the lock was broken and the court noted that the defendant did not dispute "he did not have any lease agreement, formal or informal, with his sister which may have given him exclusive or common authority with his sister over the shed." *Id.* The court held that "[s]toring personal property in an unlocked shed located on another's premises, by itself, is insufficient to show that one has the requisite standing to challenge the search and seizure of items in the shed." *Id.* Further, the court concluded, even if the defendant "shared common authority over the shed with his sister, he assumed the risk that his sister, having such common authority, would give her valid consent to search the shed in which the incriminating items would be seized." *Id.*

In the instant case, with respect to the items recovered from the shed located in the back of appellant's mother's residence, the evidence does not suggest that appellant was living at that residence, nor does the record reflect that he had any type of ownership interest in the house or shed. Further, there is no indication appellant's mother objected to the items taken from the shed; rather, the evidence suggests she had authority over the premises, and that she directed her daughter to take detectives to the shed where the items were located in trash bags. Under these circumstances, we cannot conclude that appellant has demonstrated his trial

counsel would have been successful in filing a motion to suppress the evidence at issue. *See State v. Connors-Camp*, 2d Dist. No. 20850, 2006-Ohio-409, ¶ 32 (trial court did not err in denying the defendant's motion to suppress where the defendant's mother consented to the search of her residence, the facts indicated the defendant did not reside at his mother's home and, even if he did reside there, no evidence indicated he paid rent or had a proprietary interest in the area searched).

As to the items recovered from the Dalton residence, the evidence indicates appellant stayed with Robert Dalton at the home of Dalton's mother for approximately two months leading up to the time of the incident. According to the testimony of Dalton, the day after Payne's murder, appellant "packed up his stuff, and he left" the residence. (Tr. Vol. II, 260.) Two bags of appellant's items, however, remained in Dalton's room. We note there was no evidence that appellant ever returned to the Dalton residence, and appellant was not staying there at the time Dalton's mother, acting on her own initiative, contacted police and requested that they collect the items from her home.

Here, the facts surrounding appellant's departure arguably raises questions as to whether he abandoned the property remaining at the Dalton residence and, therefore, whether he forfeited any reasonable expectation of privacy in the items. *See State v. Gould*, 131 Ohio St.3d 179, 2012-Ohio-71, ¶ 37, 963 N.E.2d 136 (HN13 "A person who abandons property has no objectively reasonable expectation of privacy in it," and "[a] warrantless search of abandoned property does not violate the Fourth Amendment because any expectation of privacy is forfeited upon abandonment."). Even accepting, however, that appellant could show he had a legitimate expectation of privacy in the property left behind, we find, based on the evidence available to detectives at the time they visited the Dalton residence, that it was reasonable for detectives to assume Dalton's mother had apparent authority to consent to entry into the residence to recover the items. *Reynolds; Portman* at ¶ 13.

Upon review, appellant has failed to show a strong probability that the trial court should have granted a motion to suppress the subject evidence. Rather, trial counsel could have reasonably concluded that such a motion would have been futile. The failure to raise a meritless argument does not constitute ineffective assistance of counsel. *State v. Robinson*, 108 Ohio App.3d 428, 433, 670 N.E.2d 1077 (3d Dist.1996) (failure of trial counsel to file a meritless motion to suppress not ineffective representation).

More significantly, even assuming appellant could demonstrate deficient performance by his trial counsel in failing to file a motion to suppress, we agree with the state's contention that he cannot demonstrate prejudice based on the record presented. Rather, in light of the substantial evidence of appellant's guilt, as outlined above in addressing appellant's manifest weight challenge, it is not

reasonably likely the outcome of the trial would have been different had counsel moved to suppress the evidence at issue.

*State v. Hawkins*, 2016-Ohio-1404, at ¶¶ 92–107 (paragraph symbols omitted).

The United States Supreme Court set forth the legal principals governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). Establishing deficient performance by counsel "requires a showing that 'that counsel's representation fell below an objective standard of reasonableness.'" *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688). To make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Hale*, 512 F. App'x at 520 (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

In addition, the United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Court observed that while "'[s]urmounting *Strickland*'s high bar is never . . . easy[,]' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Ky.*, 559 U.S. 356, 371 (2010) and citing *Strickland*, 466 U.S. at 689). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly

14

deferential,' and when the two apply in tandem, review is 'doubly' so." *Id*. (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

Under these standards, the Court finds that the state appellate court reasonably applied Supreme Court precedent to Petitioner's ineffective assistance of counsel claim. In applying *Strickland*, the state appellate court thoroughly analyzed Petitioner's argument and determined that counsel's performance was not deficient. After detailing the applicable law, the state appellate court found that any motion to suppress the evidence found at Petitioner's mother's home or the Dalton residence most likely would have failed because law enforcement had—or at the very least believed they had—the requisite consent to search the properties. *State v. Hawkins*, 2016-Ohio-1404, at ¶¶ 92–106. The state court also explained that Petitioner arguably had abandoned the property at the Dalton residence, meaning Petitioner no longer had a reasonable expectation of privacy in the items recovered at that property. *Id.* at ¶ 105. The state appellate court thus reasoned that any motion to suppress would have been futile, and "failure to raise a meritless argument does not constitute ineffective assistance of counsel." *Id.* at ¶ 106. Based on established law, this Court cannot say that conclusion was unreasonable. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (internal quotation marks omitted); *see also Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998) ("Counsel was not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel.").

Further, the state appellate court reasonably applied established Supreme Court precedent in concluding that Petitioner could not satisfy *Strickland*'s prejudice prong. For this analysis, the court relied on its manifest-weight-of evidence discussion. In that discussion, the state appellate court noted that the jury heard important eyewitness testimony from Amy Lambert and Robert Dalton, which were complementary. And two additional witnesses (Jeffrey Bagley and David Hawkins) testified that they found Petitioner with the deceased victim. *Id.* at ¶ 85. According to Bagley, Petitioner was surprised when they arrived at the apartment but then asked Bagley to help dispose of the body. Petitioner told Bagley, "Don't tell, man. I want to watch my kids grow up." *Id.* (citing Tr. Vol. II, 341). Bagley also described for the jury how he cleaned up the crime scene. David Hawkins, who is Petitioner's uncle, similarly testified about finding Petitioner with the deceased and then assisting in the cover up. *Id.* at ¶¶ 26, 35, 37 (citing generally Tr. Vol. II, 403–26).

Beyond witness testimony, the State introduced forensic evidence (unrelated to the evidence Petitioner believes should have been suppressed) to support its theory of the case. In particular, Dr. Kenneth Gerston, a forensic pathologist with the Franklin County Coroner's Office, testified that the cause of death was ligature strangulation, and the victim suffered blunt force injuries consistent with the victim having been punched or kicked. *Id.* at ¶ 86 (citing Tr. Vol. III, 539). Dr. Gerston also noted three furrow marks on the victim's neck, indicating that the murder weapon may have been wrapped around his neck three times. *Id*. at ¶ 60 (citing Tr. Vol. III, 543). Further, the victim's injuries were consistent with someone who had been struggling, including nail marks near his neck. *Id.* at ¶ 60 (citing Tr. Vol. III, 544). Dr. Gerston testified that the injury caused to the victim was consistent with strangulation by the type of instrument admitted at trial and identified by Lambert as the murder weapon. *Id*. at ¶ 86.

16

Based on all of this, the state appellate court decided that Petitioner could not satisfy *Strickland*'s prejudice requirement. That conclusion was not unreasonable, and Petitioner accordingly cannot satisfy AEDPA's high standards with regard to his Sixth Amendment claim. *See Moss v. Olson*, 699 F. App'x 477, 483 (6th Cir. 2017) (noting that under AEDPA's "purposefully strict standard[] . . . [t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable [which] is different from asking whether defense counsel's performance prejudiced Petitioner under *Strickland*") (internal quotation marks omitted).

### B. Claim Two

Although Respondent argues that claim two fails, this Court previously dismissed that claim. (Doc. 4). Consequently, the Court need not address Respondent's argument.

### III. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Petition (Doc. 1) be **DENIED** and this case be **DISMISSED**.

### Procedure on Objections to Report and Recommendation

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.

Date: February 8, 2018  /s/Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE